IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 23, 2014 Session

## STATE OF TENNESSEE v. ANTHONY TODD GHORMLEY

**Appeal from the Circuit Court for Blount County**
**No. C17294      Don R. Ash, Senior Judge**

**No. E2013-01932-CCA-R3-CD - Filed November 5, 2014**

In an opinion filed on January 20, 2012, this court determined that the trial court erred by failing to hold a competency hearing and remanded the case to the trial court to conduct a retrospective competency hearing. *See State v. Anthony Todd Ghormley*, No. E2010-00634-CCA-R3-CD (Tenn. Crim. App., Knoxville, Jan. 20, 2012) (*Ghormley I*). Following the hearing on remand, the trial court concluded that the defendant was competent to stand trial. The defendant now appeals that decision. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and TIMOTHY L. EASTER, SP. J., joined.

Kevin W. Shepherd, Maryville, Tennessee, for the appellant, Anthony Todd Ghormley.[1]

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Ellen Berez, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Blount County Circuit Court jury convicted the defendant of two counts of

---

[1]The defendant has tried, more than one time, to "fire[]" his appointed counsel. This court declined Mr. Shepherd's request to withdraw from this case, noting that the defendant is not entitled to appointed counsel of his own choosing. *See State v. Anthony Todd Ghormley*, No. E2013-01932-CCA-R3-CD (Tenn. Crim. App., Knoxville, May 8, 2014) (Order).

attempted first degree murder, one count of especially aggravated kidnapping, two counts of especially aggravated burglary, and three counts of aggravated assault for his brutal attack on three women, including his wife and her grandmother, and the trial court imposed a sentence of 105 years' incarceration. *See State v. Anthony Todd Ghormley*, No. E2010-00634-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Knoxville, Jan. 20, 2012) (*Ghormley I*). The defendant beat the women with a baseball bat, cut them with a knife, and, after the other two women escaped, held his wife's grandmother hostage in her own home for several hours during a stand-off with police. *See id.* On direct appeal, the defendant claimed, among other things, "that the trial court erred by refusing to hold a competency hearing or to reset the trial date when defense counsel raised the question of [the defendant's] competency to stand trial two weeks before trial started" and "that the trial court improperly based a finding of competency entirely on the trial court's observations of the defendant in the course of the pretrial process, despite other evidence that suggested [the defendant] was incompetent." *Id.* Based on a letter to the trial court from Middle Tennessee Mental Health Institute ("MTMHI"), the defendant's complaints that he had not received his required medication at the jail, and the defendant's myriad, obscenity-laden pro se pleadings, this court concluded that "a reasonable judge should have experienced doubt as to [the defendant's] competency" and remanded the case "to the trial court for a hearing to determine whether [the defendant] was competent to stand trial in September 2009." *Id.*, slip op. at 6. We affirmed the judgments of the trial court in all other respects. *See id.*, slip op. at 11.

Upon remand, the Chief Justice of our supreme court appointed Senior Judge Don R. Ash to preside over the defendant's case.

At the June 14, 2013 retrospective competency hearing, the defendant testified that before his evaluation at MTMHI, he had been diagnosed with bipolar disorder and prescribed Paxil. He had also been prescribed Depakote at one point. He did not take any prescribed medication in the two weeks just prior to his trial, admitting that he had refused his medications prior to trial because he "was afraid they'd – this is going to sound stupid, but I was afraid they was going to put disease in me because they hated me." He said that when he was properly medicated, he did not "get so blessed wound up," explaining, "And I can see sometimes how I bounce around like a durned ping-pong ball. I wrote one complaint on [defense counsel] and I wrote the Board back and told them to drop it, I was sorry."

The defendant believed his first trial to be "one conspiracy" involving defense counsel, "the Judge, DA," and a woman who worked for the DA's office designed to "railroad [him] on through the system." During his trial, he "started seeing shadow people out of the corners of [his] eyes." He said that he had "fired" other attorneys before his

current counsel was appointed, and he accepted blame for their failure to work together.

During cross-examination, the defendant acknowledged that on May 27, 2008, he filed a petition for an order of protection to prevent the jail officials from making him take his medication. He identified a form signed by him on June 16, 2008, refusing all medical treatment or medical services from the Blount County Jail. This document specifically stated, "To discontinue all medications."

During the summer of 2008, the defendant filed a number of pro se motions, each of which was titled aptly and filed in the correct court and each of which cited appropriate legal authorities and asked for specific legal relief. On August 15, 2008, he filed a pro se motion for a forensic evaluation. The State exhibited the pleadings to the hearing.

At the conclusion of his testimony, the defendant told the court, "I get ill sometimes and I write bad letters, but that's just writing." Following this testimony, the defense rested.

Doctor Rokeya Farooque, an MTMHI forensic psychiatrist with 20 years' experience who conducted the forensic evaluation of the defendant, testified at the June 2013 hearing that at the time of the defendant's 2007 evaluation, "each and every letter" sent from MTMHI detailing the results of forensic evaluations, including the January 15, 2008 letter that caused this court concern, included the following statement: "This is to advise the Court that the evaluation psychiatrist is of the opinion that it will be necessary for the defendant to take psychiatric medication in order for his psychiatric condition to remain sufficiently stable to continue to be competent to stand trial." This boilerplate language was initially included because many of the patients seen at MTMHI were psychiatrically ill and did require medications to become and remain competent to stand trial. Doctor Farooque said that, after realizing that including the language in every letter was problematic, MTMHI administrators restricted the use of that language to those cases that demonstrated need for the accused to be medicated to retain competence.

At the conclusion of her evaluation, Doctor Farooque diagnosed the defendant with "intermittent explosive disorder" and explained that "he is not able to control his behavior. He gets upset, he gets agitated. . . . [H]is practice is that he lost his temper." She acknowledged that the defendant reported having previously been diagnosed with bipolar disorder but said that her evaluation did not support that diagnosis. On the contrary, she "did not find any other kind of psychotic disorder that he has or he had that can cause any kind of psychotic features or any other kind of really serious mental illness." The forensic evaluation established that the defendant was of average intelligence with no cognitive impairments. Additionally, the defendant "was aware of each of his charges" and understood

that conviction of the charges would likely result in his being incarcerated for the rest of his life. The defendant showed the ability to work with his attorneys and to recognize and distinguish inculpatory and exculpatory evidence, as well as an "adequate understanding of the adversarial nature of the adjudication process and the roles of the participants." The defendant initially told evaluators that he would decline any plea offer, but he later said he would accept an offer that included a sentence of 10 years and that he believed that he would likely receive a life sentence without parole if convicted.

While the defendant was at MTMHI, he received "Ativan and Vistaril to calm him down because he was very much [a] problem in [the] unit." The defendant also took Trazodone, which Doctor Farooque described as a "kind of antidepressant medication[], but its efficacy as [an] antidepressant is not that good. . . . [B]ut it has sedating power. So, the psychiatrists use it as a sleeping aid." When the defendant returned to the jail, Doctor Farooque prescribed only the Vistaril because "the jail doesn't give Ativan because . . . of the potentiality for abuse." Vistaril, she said, "doesn't change your mental condition; or if you are psychotic, it doesn't get better; if you are depressed, it doesn't get better." She maintained that the defendant did not need to take the Vistaril to remain competent; he was competent with or without the medication. That said, she noted that given his behavior at MTMHI, "the possibility that [the defendant] may act out or disrupt courtroom proceedings [could] not be dismissed," nor could "the possibility be dismissed that he may engage in some other activity in an effort to delay the resolution of his charges."

Doctor Farooque said that the defendant reported having been previously prescribed Depakote, which she described as an anti-convulsive medication used by psychiatrists "just to control the behavior." Depakote is not an anti-psychotic medication. The defendant had not previously been hospitalized for mental health issues. The defendant asked Doctor Farooque about mounting an insanity defense "[m]any, many times" and "asked [her] to get case law . . . . [b]ecause he said that he . . . was thinking of pleading insanity defense."

Doctor Farooque noted that although defense counsel reported to her just before the June 2013 hearing that the defendant was "not okay," it was her observation that "in the courtroom, he's really behaved wonderfully."

During cross-examination, Doctor Farooque reiterated that the boilerplate regarding the continued need for medication to retain competence "just became generalized" because "most of [her] patients are psychiatrically ill." She emphasized that the defendant's "behavior was not – because in my opinion, and I'm doing it for last 20 years, was not from any mental illness. So, if he acted out . . . it was not because he did it from his mental illness." She observed the defendant once every 48 hours during his entire stay at MTMHI,

and at no time during the forensic evaluation did he display any symptoms of a mental illness. As was her practice in every case, she recommended that the defendant be seen for follow-up care by the outpatient coordinator. The defendant's lack of follow-up care would be cause for some concern, "[b]ut it is not that much important because he was not psychotic." She "did not give him any medication that if he stops taking those medicine he is going to deteriorate or he's going to improve with that medicine." As a result, follow-up care was not necessary for the defendant to maintain competence.

The defendant had apparently received a diagnosis of bipolar disorder while incarcerated previously, but she did not consider it a credible diagnosis because there was no description of the defendant's actual symptoms. The defendant self-reported having been diagnosed with bipolar disorder and schizophrenia, but she saw no evidence of either ailment during his forensic evaluation.

Senior Judge Jon Kerry Blackwood, who was appointed to preside over the defendant's trial, testified that during a January 29, 2009 hearing, he told the defendant that he would order a forensic evaluation, but when he discovered that the defendant had already been evaluated at MTMHI and declared competent, he did not order a second evaluation. Judge Blackwood said, "I never had any doubt that [the defendant] was nothing but competent. I came to that conclusion shortly after I was designated to hear this case." He described the defendant as "very intelligent, very articulate" and noted that "if you can remove his profanity from his comments, [he] expresses himself very well." The defendant's letters and pro se pleadings, aside from the prolific use of profanity, demonstrated "an inordinate amount of knowledge about the legal system" and established that the defendant "was very well-versed in the intricacies of practicing law." Judge Blackwood said, "If you get through the hysterical parts of the letters, he makes citations to Supreme Court cases which are correct citations about the legal principle that he was attempting to argue." The defendant's pro se pleadings included a "correctly filed" petition for writ of mandamus "asking the [c]ourt to order the Circuit Court Clerk to do various parts of his duties" and discovery motions that showed knowledge of the rules of discovery.

At one point, after his first two attorneys had been allowed to withdraw, the defendant asked and was permitted to represent himself. Later, the defendant wrote a letter to the court saying that he would accept appointed counsel "from Knox County." The trial judge noted that the defendant "listed the various lawyers that he would accept. Greg Isaacs, Herb Moncier, Doug Trant, . . . Charles Burks. All these were well-known criminal defense attorneys in Knoxville. So, he had enough sense about that to know that he wanted one of the best in Knox County." In the meantime, he asked to be transferred to the penitentiary so that he would be afforded a better law library for legal research.

Judge Blackwood recalled that during the period after he refused his medication, the defendant "was always alert," "he appeared to know what was going on," and "[h]e consulted with his counsel." The defendant "was polite throughout the entire trial."

During cross-examination, Judge Blackwood acknowledged that the defendant claimed to believe that there was a conspiracy to have him convicted. The defendant wore a t-shirt emblazoned with a smiley face and imprinted with "some indication of constitutional rights or due process" during the trial.

Blount County Jail medical unit supervisor and nurse practitioner Staci Lawhorn testified that jail medical records indicated that the defendant refused his medication on January 23, 2007. The notation read, "He has been ordered to have Cherokee Health do competency/insanity evaluation. And he wants them to see how he really is and not on meds. Informed inmate, this will not affect [the not guilty by reason of insanity] evaluation." Another notation related to the January 23, 2007 refusal stated that the jail psychiatrist wanted the clinical social worker "to convey to inmate that having an evaluation without meds will not increase his chances of a successful [not guilty by reason of insanity] plea. But if he wishes to [discontinue] Depakote, this is his choice." The psychiatrist also noted that the defendant did "not appear to have any severe problems to warrant immediate medical stabilization."

Upon the defendant's release from MTMHI, the jail received the defendant's discharge summary and prescriptions for Vistaril and Prilosec. Shortly after his return to the jail, the defendant, whom Ms. Lawhorn described as "always cooperative and alert, oriented," began refusing all medication except the "indigent Tylenol." She explained that at that time, indigent inmates were offered "an indigent pack of Tylenol or ibuprofen. [The defendant] requested Tylenol close to every week." The request had to come in prior to Wednesday, and the defendant was able to track the days of the week and properly file his request each week. In her observations, the defendant did not appear to be depressed, delusional, or out of touch with reality. She said that he was never on anti-psychotic medications.

The defendant refused his medication "consistently toward the end of May and then," in June 2008, he signed a written refusal. At the time he signed the refusal in June, "[h]e was getting the Prilosec, generic Prilosec, generic Vistaril. . . . aspirin, 81 mg, and Daypro, which is an anti-inflammatory." On a June 1, 2008 request for medical care, he said, "[P]lease stop harassing me. I have already . . . stated I'll not take any meds handled by this unethical medical staff . . . From now on, I will tell guard that brings contaminated meds to my cell that I want them, then I will threw . . . under door and they can pick it up."

On July 28, 2008, the defendant asked to see a mental health doctor. The clinical social worker at the jail, who acted as a clearing house for such requests, wrote on July 31, 2008, "[I]nmate has history of demanding meds and then refusing. Discharged from [MTMHI] only on hydroxyzine. Placed on mental health waiting list. Moderate priority level." Ms. Lawhorn stated that hydroxyzine is the generic name for Vistaril. A December 11, 2008, notation "says no new requests, taken off mental health waiting list."

On February 2, 2009, the defendant wrote a letter that prompted the clinical social worker to visit him on February 5, 2009. The defendant complained of "stomach problems, diarrhea with blood." The social worker offered the defendant "hydroxyzine or SSRI for anxiety and nightmares. And he declined because he didn't think he should be forced to take medications for the way he is being." At that time, the defendant reported difficulty sleeping but did not report any severe mental illness. Importantly, the clinical social worker did not observe any mental illness and reported that the defendant appeared to be "thinking clearly and . . . goal directed, spontaneous."

During cross-examination, Ms. Lawhorn stated that she had never seen the January 15, 2008 letter from MTMHI; she had seen only the discharge summary. She also was not privy to the defendant's records from his previous incarceration in the department of correction. Also, the defendant did not relay in "his health screen where we ask them their health history" any previous diagnosis of bipolar disorder, and nothing indicated that the defendant had been admitted to the jail "with a psychiatric diagnosis." The jail psychiatrist, she said, typically prescribed Depakote "for mood stability." Jail records did not show that the outpatient coordinator had ever come to the jail to meet with the defendant, but those records would not have indicated whether the defendant had been taken to see the coordinator. The defendant was seen by the jail psychiatrist, as it was the usual policy for the jail medical staff to provide follow-up care "so that it's less transportation." To this end, the jail medical staff followed the instructions provided in the defendant's discharge summary.

In a written order declaring the defendant competent, the trial court found that the evidence did not support a conclusion that the defendant "required medication to maintain competency" given that "Dr. Farooque was unambiguous in her opinion the [d]efendant did not require medication to maintain competency and the letter was incorrect to the extent it stated otherwise." The court noted that Doctor Farooque's "testimony was supported by the Forensic Discharge Summary . . . and the prescription she sent to the jail with the [d]efendant . . . . The medication prescribed was Vis[t]aril and she was emphatic this medication did not affect his competency." The court also found that "any medication . . . prescribed was offered to the defendant on many occasions and it was the [d]efendant's own choice to refuse the medications." The court observed that the defendant was incarcerated in the department

of correction in the two weeks prior to the September 4, 2009 hearing on the defendant's "alleged lack of competency due to a lack of medication" and that the trial court had "offered to have the [d]efendant housed at Blount County until trial in order to ensure the [d]efendant would receive his medication," an offer that the defendant rejected. When the defendant returned to the Blount County Jail, the only medication he requested "was Tylenol, despite the issues he was raising concerning a lack of competency due to no medication." The court noted that Ms. Lawhorn "was clear in her assessment she did not observe any need for anti-psychotic medications for the [d]efendant" and that "Judge Blackwood stated he never believed the [d]efendant was anything but competent." Additionally, the court observed that the defendant was "very involved in his own case and he files numerous pleadings even when represented by counsel. This, however, does not in this Court's opinion demonstrate incompetency on the part of the [d]efendant under all the circumstances." The court described the defendant as "persistent and driven in his pursuit of issues in his case," and it noted that although "his arguments may not always be successful, he is certainly able to assist counsel and to consult with counsel which this Court observed him do both in court and through pleadings." Finally, the court noted that the defendant was without his medications during the retrospective competency hearing and that the court "observed no behavior which called the [d]efendant's competency into question." On the basis of the findings, the court determined that "the [d]efendant did not carry his burden to establish his incompetency to stand trial by a preponderance of the evidence" and that "the evidence supports the [d]efendant was in fact competent at the time of trial."

In this appeal, the defendant challenges the trial court's ruling that he was competent to stand trial.

"The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution prohibit a mentally incompetent person from being put to trial." *State v. Reid*, 213 S.W.3d 792, 808 (Tenn. 2006) (citing *Pate v. Robinson,* 383 U.S. 375, 378 (1966); *State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000)). That said, "[i]n Tennessee, a criminal defendant is presumed to be legally competent." *State v. Johnson*, 401 S.W.3d 1, 17 (Tenn. 2013) (citing *State v. Reid*, 164 S.W.3d 286, 306-07 (Tenn. 2005); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)). As such, the defendant bears the burden of establishing his incompetence by a preponderance of the evidence in the trial court. *See Reid*, 164 S.W.3d at 306-08. The assessment of competency is multi-pronged. To be deemed competent, a defendant must possess "'the capacity to understand the nature and object of the proceedings against him [or her], to consult with counsel[,] and assist in preparing his [or her] defense.'" *Johnson*, 401 S.W.3d at 17 (quoting *Reid*, 164 S.W.3d at 306). "A defendant may prove his or her incompetency with evidence of the defendant's 'irrational behavior, his [or her] demeanor at trial, and any prior medical opinion on competence to stand trial.'" *Johnson*, 401 S.W.3d at 17 (citing *State v. Kiser*, 284

S.W.3d 227, 246 (Tenn. 2009) (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975))).  The trial court's findings regarding the defendant's competence "are conclusive on appeal unless the evidence preponderates otherwise."  *Oody*, 823 S.W.2d at 559.

In our view, the record does not preponderate against the findings of the trial court.  Doctor Farooque testified that the defendant was competent and that he did not require medication to maintain his competence.  The defendant presented no evidence to the contrary.  No evidence indicated that the defendant was, at any time, unable "'to understand the nature and object of the proceedings against him [or her], to consult with counsel[,] and assist in preparing his [or her] defense.'"  *Johnson*, 401 S.W.3d at 17 (quoting *Reid*, 164 S.W.3d at 306).  Evidence concerning the defendant's behavior and demeanor evinced his competence, as did all of the medical testimony.  Finally, the defendant's pro se pleadings, though vituperative, suggested a familiarity with the legal system and an above average ability to assist in the preparation of his defense.

Accordingly, the judgment of the trial court declaring the defendant competent is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE